UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

ALICE DOWD,

                                        Plaintiff

                                                                        DECISION AND ORDER

-vs-

                                                                        12-CV-6244 CJS

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

APPEARANCES

For the Plaintiff:              William J. McDonald, Jr.
                                Bond, McDonald and Lehman, P.C.
                                91 Genesee Street
                                Geneva, New York 14456

For the Defendant:              Kathryn L. Smith, A.U.S.A.
                                United States Attorney's Office
                                100 State Street
                                Rochester, New York 14614

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Alice Dowd ("Plaintiff") for Social Security Disability Insurance

benefits and Supplemental Security Income benefits.  Now before the Court is

Defendant's motion (Docket No. [#3] for judgment on the pleadings and Plaintiff's cross-

motion [#5] for judgment on the pleadings.  Defendant's motion is denied, and Plaintiff's

motion is granted to the extent that this matter is remanded to the Commissioner for a

new hearing.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation

omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE)"](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[1] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d)[2]; see also, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) ("If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.") (citation and internal quotation marks omitted).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

If we find that a treating source's opinion on the issue(s) of the nature and

---

[1]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(a). "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a(c).

[2]20 C.F.R. § 416.969(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

> severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527).   Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6)

and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

*** 

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

VOCATIONAL HISTORY

Plaintiff was age 53 at the time of the hearing. (Tr. 47).[3]  Plaintiff's formal

education consists of high school and one year of college. *Id*.  Plaintiff also completed

specialized training in 1986 and 1998 to work as a Certified Nursing Aide. (Tr. 156).

Plaintiff has an extremely spotty work history.  Specifically, Plaintiff began working in

1978, but did not work between 1979-1986 and 1992-1996, purportedly because she

was taking care of her mother. (Tr. 132).  Plaintiff was laid off in 2002 and did not work

again until 2004. *Id*.  Plaintiff was laid off again in 2006 and did not work in 2007.  *Id*.

Plaintiff worked "very little" in 2008 and worked only part-time in 2009. *Id*.  Plaintiff

indicated that she stopped working in 2009 because funding for her job ran out, not

because of any disabling condition. (Tr. 156).  Overall, Plaintiff did not work at all during

fifteen of the thirty-two years prior to the alleged onset of her disability. (Tr. 140).  The

record indicates that Plaintiff "raised" her now-adult niece in her home during this period,

and it is unclear what effect, if any, that activity had on Plaintiff's decision not to work.

(Tr. 352).  More recently, Plaintiff moved to live near her niece, and is now helping to

care for the niece's child. (Tr. 385-386).

Plaintiff's recent work history consists of three jobs:  Certified Nursing aide,

between 1999 and 2002; secretarial office worker, between 2004 and 2006; and

transportation van driver, between 2008 and 2009. (Tr. 157).  The nursing and secretarial

jobs were essentially full-time, but the van-driving job was only sixteen hours per week.

*Id*.  At the secretarial job, Plaintiff was able to stand and/or walk for "around two or three"

---

[3]Unless otherwise noted, references are to the administrative record.

hours per day, and was able to lift and carry items weighing twenty pounds. (Tr. 60).  It is noteworthy that Plaintiff's obesity, which is her chief physical complaint, has existed relatively unchanged since 1995, and therefore pre-dates all of her past relevant work. (Tr. 50-51).

Plaintiff states, vaguely, that since 2009, she has looked for other work through a temporary agency, but "usually" the jobs are "production jobs" that require more standing than she can do. (Tr. 48).  However, a note by Plaintiff's psychologist in May 2010 indicates that Plaintiff was "unemployed - not seeking [work]." (Tr. 352).

ACTIVITIES OF DAILY LIVING

Plaintiff is morbidly obese and claims to have trouble standing and walking for long periods, due to shortness of breath, but otherwise does not claim to be very limited in her activities of daily living.  In that regard, Plaintiff is single, has no children of her own, lives by herself, and is able to perform the normal daily activities, such as caring for herself, cooking and cleaning, without assistance. (Tr. 47).  Plaintiff's niece, whom Plaintiff raised,[4]  helps Plaintiff with grocery shopping, by driving Plaintiff to the store and putting items in the grocery cart. (Tr. 60).  Plaintiff has a driver's license but does not own a car. (Tr. 55).  Plaintiff is nevertheless able to travel, by using transportation arranged by social services,(Tr. 55), or by obtaining rides from her niece. (Tr. 58, 60).  Plaintiff volunteers at a local "food closet" two or three times a week, and helps provide care for her niece's son. (Tr. 385-386).  Plaintiff's hobbies are watching television and solving crossword puzzles. (Tr. 353).

---

[4]*See*, medical note, indicating that Plaintiff raised the niece in Plaintiff's home. (Tr. 352).

MEDICAL EVIDENCE

Plaintiff's medical records are primarily from two sources – her primary care physician, Rebecca Wadsworth, M.D. ("Wadsworth"), and her mental health therapist, Eileen Ersteniuk, LCSW-R[5] ("Ersteniuk").  Wadsworth's opinions are eligible to receive controlling weight under the "treating physician rule," but Ersteniuk's are not since "social workers do not qualify as "acceptable medical sources." *Bliss v. Commissioner of Social Sec.*, 406 Fed.Appx. 541, 2011 WL 227583 at *1 (2d Cir. Jan. 19, 2011) (citing 20 C.F.R. § § 404.1513(a) & 404.1527(a)(2)).  However, the opinions of a licensed clinical social worker "may provide highly relevant evidence bearing upon the severity of an individual's impairments and how it may affect an individual's ability to function." *Davis ex rel. Maitland v. Colvin*, Civ. Action No. 6:11–CV–0658 (MAD/DEP), 2013 WL 1183000 at *9 (N.D.N.Y. Feb. 27, 2013) (citations omitted).[6] The record contains some additional medical notes and  reports, such as reports by a cardiologist and an orthopedic specialist, but test results from those doctors were essentially normal, and indicated that Plaintiff's complaints of back pain and shortness of breath were the result of her obesity and lack of physical exercise.

---

[5]According to the New York State Office of the Professions' website, the designation LCSW-R pertains to licensed clinical social workers with an "R" "psychotherapy privilege." See, http://www.op.nysed.gov/prof/sw/lcswprivilege.htm  "Psychotherapy in the conte[x]t of licensed clinical social work practice is the use of verbal methods in interpersonal relationships with the intent of assisting a person or persons to modify attitudes and behavior which are intellectually, socially, or emotionally maladaptive." *Id*.

[6]"When determining the weight, if any, to be given to opinions from such ["]other sources,["] an ALJ should consider the same factors that inform the decision of what weight to accord to treating source opinions, including (1) the frequency of which the relationship with which the source has seen the individual; (2) the consistency of the opinion with other evidence in the record; (3) the degree to which the source supports his or her opinions; (4) how well the source explains the opinion; (5) whether the source has a speciality or area of expertise related to the impairment; and (6) any other factors tending to support or refute the opinion." *Davis ex rel. Maitland v. Colvin*, 2013 WL 1183000 at *9 (N.D.N.Y. Feb. 27, 2013) (citations omitted).

For the period of 2001 through 2009, Dr. Wadsworth's office notes are generally concerned with Plaintiff's high blood pressure, elevated cholesterol and thyroid condition. The notes indicate that Plaintiff was often non-compliant with Wadsworth's recommendations about taking medications.  There is no mention of depression or back pain, except that an entry dated January 30, 2008, expressly stated that Plaintiff had *no* signs of depression. Tr. 202 ("No depression on screening done.").  Curiously, a cardiac specialist's report dated March 27, 2001, refers to Plaintiff as being "mildly retarded" (Tr. 260), and an office note, apparently from Wadsworth, indicates that Plaintiff has a "probable cognitive impairment. (Tr. 198).  However, it does not appear that Wadsworth performed any testing to confirm whether Plaintiff actually has any cognitive impairment.[7] Moreover, as discussed below, Ersteniuk subsequently conducted a full mental status examination and made no mention of any cognitive impairments.

In 2009 plaintiff complained of shortness of breath, but cardio-pulmonary testing was negative, and the cardiologist attributed Plaintiff's shortness of breath to her morbid obesity and lack of conditioning. (Tr. 310-311).  On December 4, 2009, when interviewed by her cardiologist, Plaintiff denied having any psychiatric symptoms. (Tr. 321).

On November 23, 2009, shortly after Plaintiff stopped working, Wadsworth noted that Plaintiff's last office visit had been one year earlier. (Tr. 364).[8]  On that point, Plaintiff claims that she had not been to Wadworth's office for a year because she "didn't have

---

[7]As far as mental impairment, Plaintiff only claims to have limitations related to her alleged depression. See, Tr. 46 (Plaintiff's attorney told the ALJ that Plaintiff is "sort of limited by the intellectual limitations from depression.").

[8]Wadsworth's notes also refer to Plaintiff having numerous teeth pulled, as a result of failing to obtain dental care over a period of decades.

any way to get there," but does not explain why she could not obtain a ride through social services, or from her niece, who lives nearby and takes Plaintiff grocery shopping. (Tr. 58, 60). In any event, Plaintiff told Wadsworth that she experienced shortness of breath upon exertion, which made it difficult for her to walk far. (Tr. 364). There is no indication that Plaintiff complained of depression or back pain at that time.

In May 2010, Plaintiff went to Wayne Behavioral Health Network for a mental health evaluation, upon the referral of her former employer, Wayne County Action Program. (Tr. 379).[9] On May 18, 2010, Ersteniuk completed a diagnostic form, in which she stated her "diagnostic impressions/concusions" as follows: "No prior history of mental health treatment, ongoing low grade depressive symptoms, client denies [suicidal ideation or homicideal ideation]." (Tr. 346-347). Ersteniuk's particular diagnosis was "dysthymic disorder," and she recorded these observations:

> [C]lient reports she has been out of work and has been depressed since her mother died [fifteen years earlier, in 1995].[10] She has low motivation and over eats and over sleeps. She has not [sic] social life and few friends. . . . [O]bese, chronic pain . . . never married, still grieving mother's death, few supports no work.

(Tr. 346). Ersteniuk, though, specifically indicated that she found no evidence of mental retardation, such as impaired "general intellectual functioning" or "adaptive functioning." (Tr. 346).

On June 30, 2010, Ersteniuk completed an "Assessment for Services" form. (Tr.

---

[9]Although, as mentioned earlier, when Plaintiff was interviewed by the Commissioner at around this same time, on May 22, 2010, Plaintiff indicated that she had *no* new mental illnesses or limitations since she applied for disability benefits. (Tr. 166, Ex. 4E).

[10]Plaintiff's mother died in 1995. (Tr. 385).

348).  Ersteniuk reported that Plaintiff saw her siblings "a few times a year" and "got

along" with them, though they were not close. (Tr. 350).  Ersteniuk noted that Plaintiff's

"current support systems" consisted of "family support and involvement." (Tr. 350).

When asked to check off any "handicapping conditions" that Plaintiff had, Ersteniuk did

*not* check any category, including "learning disability," "behavior problems," "emotional

disability" or "mental retardation." (Tr. 351).  Ersteniuk stated that Plaintiff's employment

status was "unemployed – not seeking." (Tr. 352).  When asked to describe Plaintiff's

strengths, Ersteniuk stated that Plaintiff was motivated for treatment, was able to care for

herself and/or others, and had "good intellectual skills." (Tr. 352).  When asked to list any

potential barriers to treatment, Ersteniuk stated that Plaintiff had "physical problems" and

was "socially withdrawn." (Tr. 353).  Ersteniuk, though, did *not* check boxes indicating

that Plaintiff had any problems with intellectual functioning, communication skills,

learning difficulties, limited attention span or memory impairment. (Tr. 353).

Ersteniuk reportedly performed a mental status examination, and found that

Plaintiff was well-groomed, cooperative, calm, focused, and had an appropriate affect,

although she was "sad." (Tr. 354).  Plaintiff's orientation, memory and concentration were

intact, though her insight and judgment were "limited." *Id*.  Plaintiff's primary complaint

was "sadness." (Tr. 355).  Ersteniuk recorded the following comments:

> 52 y[ear old] female presents with a history of depression which she never
> sought treatment for.  She is alone and recently unemployed.  She states
> she is lonely and sad most of the time.  She lost her mother in '95 and still
> is grieving that loss.  She has some friends and her niece who she raised
> and [the niece's] son that she helps care for.

(Tr. 355).  Ersteniuk assigned Plaintiff a Global Assessment of Functioning ("GAF") score

of "50," based on "serious impairment in social functioning" and "serious impairment in occupational/school functioning." *Id*.

Ersteniuk's treatment plan was to see Plaintiff two-to-four times per month, "to address coping skills, decrease symptoms and maintain stability." (Tr. 356).  However, on October 19, 2010, Ersteniuk completed a "discharge summary," indicating that Plaintiff was being discharged "due to non-compliance." (Tr. 367).  Specifically, Ersteniuk reported that Plaintiff did attend at least one session, but failed to attend her July, 2010, appointment and also failed to respond to the agency's correspondence in September, 2010. (Tr. 368); see also, *id*. at (Tr. 369) ("Client was non-compliant with treatment, withdrew.").

In late 2010,[11] Plaintiff had another office visit with Wadsworth, at which time she claimed to be feeling "sad all the time." (Tr. 392).  Plaintiff reportedly told Wadsworth that she "was seeing a counselor," referring to Ersteniuk, and that she had been told she "needed pills for depression." *Id*.[12]  There is no indication, though, that Wadsworth had personally seen any report from Wayne County Behavioral Health to corroborate Plaintiff's statement, nor any indication that Wadsworth  herself conducted any type of interview or testing concerning Plaintiff's alleged depression.  Moreover, as noted above, Plaintiff had not seen Ersteniuk since before July 2010, and there is no indication in Ersteniuk's notes that she actually ever told Plaintiff that she needed medication.

---

[11]The exact date of the office note is unclear, but it appears to be either October 15, 2010 or December 15, 2010. (Tr. 392).

[12]Of course, as of that date, Plaintiff had not been treating with Ersteniuk since prior to July.  Moreover, since it appears that Ersteniuk was treating Plaintiff under the supervision of psychiatrist Ronald Biviano, M.D., it is unclear why Ersteniuk would have advised Plaintiff to ask Wadsworth for an antidepressant prescription. (Tr. 362).

Nevertheless, Wadsworth apparently accepted Plaintiff's statement at face value and wrote in the office note: "depression - probably a large part of the problem[13] - begin Zoloft." *Id*.

On January 27, 2011, Wadsworth noted that she had received "mult[iple] pieces of paperwork for depression, AODM [diabetes], [and high blood pressure] for SSD, SSI," apparently from Plaintiff's disability attorney. (Tr. 393). In other words, less than a month after Plaintiff told Wadsworth that she was feeling depressed, her attorney asked Wadsworth to complete medical paperwork relating to Plaintiff's conditions, including the depression, in support of an application for disability benefits. At that time, Wadsworth's only treatment of the depression consisted of prescribing Zoloft.

Nevertheless, on January 27, 2011, Wadsworth, who is apparently a general practitioner and not a psychiatrist, completed a mental RFC assessment using a form provided by Plaintiff's attorney. (Tr. 374-377). In that regard, Wadsworth's diagnosis of Plaintiff was as follows: "depression, ? mild cognitive impairment" [sic]. (Tr. 377). Curiously, when asked to state, to a reasonable degree of medical certainty, when Plaintiff's limitations started, Wadsworth wrote "2004," without explanation. *Id*. Wadsworth also stated, without any explanation, that Plaintiff's "limitations" had been continuous since September 2009. (Tr. 377). Wadsworth stated that Plaintiff had an "unlimited" ability to respond appropriately to supervision, to respond appropriately to co-workers, to exercise good judgment and to follow occupational rules. Wadsworth reported that Plaintiff had a "good" ability to remember detailed instructions, to remember

---

[13]It is unclear as to what "problem" Wadsworth was referring.

13

and carry out simple instructions and to remember work procedures.  Wadsworth stated, though, that Plaintiff had only a "fair" ability to complete a normal workday on a sustained basis, to concentrate and attend to a task over an 8-hour workday, to make simple work-related decisions, to maintain social functioning, to be aware of normal hazards and to tolerate work pressures.  On those points, the form indicates that a "fair" ability means "[t]he ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times." (Tr. 374).  As for specific problems, Wadsworth wrote: "has an issue [with] sleep during [the] day"; "[ability to function independently on a job] depends on physical limitations"; "gets easily depressed, cries"; "stress causes decompensation." Wadsworth was further asked whether Plaintiff's condition had "deteriorated" under stress, such as job stress, and if so, when it happened last, and Wadsworth stated: "December 20, 2010," indicating that Plaintiff had some type of "deterioration" at her volunteer job, about which the record contains no further information. (Tr. 376-377).  When asked how many days per month Plaintiff might miss work due to her alleged problems, Wadsworth checked the box indicating "about four days per month," but then inconsistently indicated that Plaintiff could only work two days per week, apparently because Plaintiff was then-currently spending only two days per week at her volunteer "job." (Tr. 377).

Wadsworth also completed a physical RFC form provided by Plaintiff's attorney. (Tr. 371-373).  Wadsworth indicated that Plaintiff's medical problems consisted of diabetes, low-back pain, high blood pressure, morbid obesity and "noncompliance." (Tr. 371).  Wadsworth opined that Plaintiff could occasionally reach, but could never climb, balance, stoop, crouch, crawl, climb stairs, push or pull. (Tr. 372).  Wadsworth reported

14

that, during an 8-hour workday, Plaintiff could sit for a total of seven hours, sit for up to

two hours continuously, walk for a total of fifteen minutes, and stand for a total of fifteen

minutes. (Tr. 372).  Wadsworth stated that Plaintiff could lift and carry less than ten

pounds. *Id*. Wadsworth indicated that Plaintiff's pain and other symptoms would

frequently interfere with her attention and concentration. (Tr. 373).  Finally, Wadsworth

stated that Plaintiff could work only two days per week. *Id*.

   In March, 2011, Plaintiff returned to Wayne Behavioral Health Network, after

having been discharged for noncompliance.  On March 7, 2011, Ersteniuk signed  a

"Assessment for Services" form for Plaintiff, that was apparently written on March 4,

2011. (Tr. 379-389).  Ersteniuk reported that Plaintiff had taken the medication Sertraline

(Zoloft), apparently prescribed by Wadsworth,  which was not effective. *Id*. at 379.  Most

of the other information on the form was the same information that Ersteniuk had written

in 2010.  Ersteniuk reportedly conducted a mental status exam, and found that Plaintiff

seemed well groomed, cooperative, calm, and sad, and her thoughts seemed focused.

*Id*. at 386.  Plaintifff's orientation, memory and concentration were all intact, though her

insight and judgment were limited. *Id*.  Plaintiff denied any suicidal ideation. *Id*.  Overall,

Plaintiff reported that since her mother's death, she chronically felt "down," "lonely" and

"sad," but was able to function. *Id*. ("functions, sleeps eats all ok but just feels down.").

Plaintiff stated that she was taking Zoloft, but it did not help her symptoms. *Id*.  Similar to

her earlier report, Ersteniuk's diagnosis was "dysthymic disorder," and she noted

Plaintiff's "ongoing *low grade* depressive symptoms." *Id*. at 389 (emphasis added).

Moreover Ersteniuk again gave Plaintiff a GAF score of "50."  Ersteniuk stated that her

treatment plan was to see Plaintiff two or four times per month, to help improve Plaintiff's

"coping skills" and decrease her symptoms. *Id*.

On March 16, 2011, Plaintiff reportedly told Wadsworth that she was having trouble sleeping at night, and was falling asleep during the day. (Tr. 393).   It appears that Wadsworth indicated that Plaintiff should be tested for obstructive sleep apnea ("OSA"). *Id*.  It does not appear that Plaintiff said anything concerning depression at that time.

On June 17, 2011, Plaintiff reportedly told Wadsworth that she "need[ed her] disability paperwork done," and indicated that she had been feeling-low back pain for five days, especially when changing positions.  (Tr. 398).  Plaintiff stated that she took the over-the-counter pain medication Aleve, which helped, but that she "avoid[ed] it."  *Id*. Upon physical examination, Plaintiff seemed tender in her lower back. *Id*.  Wadsworth diagnosed "low back spasm," prescribed Flexeril, and told Plaintiff to take Aleve as needed. *Id*.  Apparently, nothing was said on that occasion concerning depression.

PROCEDURAL HISTORY

On February 23, 2010, Plaintiff applied for disability insurance benefits, claiming that she became disabled on September 1, 2009.  Plaintiff claimed to be disabled due to six conditions: High blood pressure, diabetes, "thyroid," "pain in back," obesity and high cholesterol.  (Tr. 155).  With regard to obesity, Plaintiff indicated that her height was 5' 6" and her weight was 356 pounds. *Id*.  Plaintiff did not claim to have any mental or emotional impairments, and she indicated that she had never sought treatment for "any mental condition(s) (including emotional or learning problems)." (Tr. 152).  While being interviewed in connection with her initial application for disability benefits, Plaintiff did not display any problem understanding or concentrating. (Tr. 152, 134).  On May 22, 2010,

16

Plaintiff was again interviewed by the Commissioner, and denied having any new mental illnesses or limitations since she applied for disability benefits. (Tr. 166, Ex. 4E).

On April 6, 2010, the Commissioner had Plaintiff undergo an internal medical examination by Harbinder Toor, M.D. ("Toor"), an non-treating independent examiner. (Tr. 327-330). Plaintiff reportedly told Toor that she had been experiencing chronic low-back pain for seven years, following an injury while she was working as a nurse's aide. (Tr. 327). However, there is no mention of such an injury or of such a history of pain in Wadsworth's notes. Plaintiff further told Toor that she had difficulty standing, walking, sitting, bending and lifting, due to back pain. *Id*. Toor observed that Plaintiff was obese and that she declined to lie down on the exam table, purportedly because of obesity and back pain. (Tr. 328). Plaintiff also declined to perform the straight leg raising test for back pain. Toor's physical examination was essentially unremarkable, in that Plaintiff had full range of motion in her cervical spine, shoulders, elbows, forearms, wrists, hips, knees and ankles, full strength in her upper and lower extremities, and full grip strength and dexterity in her hands. (Tr. 329). Plaintiff did have some limitation of movement in her lumbar spine. *Id*. Toor concluded that Plaintiff

> has moderate limitations standing, walking, sitting, or lying down because of back pain and obesity. She has moderate to severe limitations bending or heavy lifting because of obesity and back pain. She should avoid irritants or other factors which can precipitate asthma.

(Tr. 330).

On April 12, 2010, an agency medical consultant, "D. Valla," whose credentials are not indicated, completed a residual functional capacity assessment, stating that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand about six

hours, sit about six hours, with unlimited ability to push and/or pull. (Tr. 333).

On April 12, 2010, the Commissioner denied Plaintiff's application.  On August 4, 2011, a hearing was held before an Administrative Law Judge ("ALJ").  At that time, in addition to her physical complaints, Plaintiff claimed to be disabled due to depression. Plaintiff was represented by her attorney and testified at the hearing.  The ALJ also took testimony from a medical expert, Jose Rolon-Rivera, M.D. ("the ME"), and from a vocational expert, Hector Puig ("the VE").

At the hearing, Plaintiff indicated, in pertinent part, that Wadsworth had recommended that she go on a "strict diet," and that Plaintiff had done so for awhile and had lost twenty to thirty pounds, but then "leveled out."  (Tr. 59).  Plaintiff further indicated that she does not eat much anyway, although the record indicates that she previously complained about the fact that she overeats. *Id*.  The ME indicated, *inter alia*, that Plaintiff could occasionally lift and carry twenty-five pounds, frequently carry ten pounds, and stand and/or walk for up to two hours. (Tr. 62-63).  The ME acknowledged, though, that he never examined Plaintiff and that he was primarily basing his opinion on the report of Valla, who did not examine Plaintiff and whose medical credentials are not stated in the record. (Tr. 66).  The VE testified that despite the limitations on Plaintiff's ability to sit and stand, and despite the need for her to change position and for the work to be simple, she could still perform her past relevant secretarial work, which is considered semi-skilled light work.  (Tr. 71-73, 76).[14]  The VE further stated that if Plaintiff was limited to sedentary, simple, unskilled work, she could still perform certain jobs, such

---

[14]The VE indicated that since Plaintiff's prior secretarial job was light work, it would ordinarily require the ability to stand for up to six hours during an eight-hour workday. (Tr. 77).  However, Plaintiff testified that, as she actually performed the job, it did not require that amount of standing.

as office support work, DOT # 209.582-018 and order clerk, DOT # 209.567-014. (Tr. 73-74).

On August 23, 2011, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 24-37).  In that regard, at the first step of the familiar five-step sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful employment since September 1, 2009.(Tr. 26).

At the second step of the analysis, the ALJ found that Plaintiff has the following severe impairments: "morbid obesity, low back pain, and history of asthma." (Tr. 26). The ALJ found, however, that Plaintiff's claimed depression was not severe. (Tr. 27).  On this issue, the ALJ found that, according to Ersteniuk's mental status examination, Plaintiff was sad about her mother's death fifteen years earlier, but otherwise her examination was unremarkable. *Id*.  The ALJ found that Ersteniuk's diagnosis of dysthymia was supported by the record, and entitled to significant weight, but that the GAF score was not, because it was unsupported in the record. *Id*.  On that point, the ALJ observed that Plaintiff claimed to have friends and family support, and that she was able to care for herself and others. *Id*.  Accordingly, the ALJ did not give the GAF score significant weight.  The ALJ further noted that Plaintiff's dysthymia did not appear to significantly impact her ability to care for herself or to relate to others, and that it had not resulted in any significant episode of decompensation.  (Tr. 28).

At step three of the five-step analysis, the ALJ found that Plaintiff does not have a listed impairment or combination of impairments that meets or equals a listed impairment. (Tr. 28).

At step four of the five-step analysis, the ALJ determined Plaintiff's RFC as

follows:

> [C]laimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b).  She is able to lift/carry 20 pounds occasionally and 10 pounds frequently.  She is able to sit for 6 hours during an 8-hour workday and to stand/walk for up to 2 hours during the same 8-hour period, but she needs to change her position at will.  The claimant can perform occasional climbing, balancing, stooping, kneeling, crawling, and crouching.  She has to avoid respiratory irritants, fumes and extreme temperatures.  Finally, she is able to perform simple work and follow simple tasks.

(Tr. 29).  In finding that Plaintiff could perform some light work, the ALJ noted that Plaintiff's obesity could reasonably affect her exertional activity, but that Plaintiff's weight had essentially remained constant since 1995, and that Plaintiff had previously been able to perform medium work at that same weight. (Tr. 30).  In making this RFC determination, the ALJ further noted that Toor's examination was essentially normal, except for Plaintiff's obesity, some limited range of movement in the lumbar spine, and claimed pain in the lower back.  The ALJ determined that she could not give controlling weight to most of Wadsworth's RFC assessments, though she gave significant weight to Wadsworth's opinion regarding Plaintiff's ability to sit for up to seven hours in a workday, and to sit for up to two hours at a time. (Tr. 32).   The ALJ gave "little weight" to the rest of Wadsworth's opinions, finding that they were inconsistent with Wadsworth's own treatment notes.  *Id*.  In that regard, the ALJ stated that Wadsworth's notes showed essentially no support for any musculoskeletal or neurological abnormalities, except for one exam in which she found evidence of a lower-back spasm.  *Id*.  The ALJ gave some weight, but not controlling weight, to Wadsworth's mental RFC assessment, and found that Plaintiff should be restricted to "simple tasks and instructions," due to her affective

disorder.  (Tr. 33).

Based on her RFC determination, the ALJ concluded that Plaintiff is not disabled, because she can perform her past relevant secretarial work, which, as she actually performed it, requires less than the full range of light exertional ability.  On that point, the ALJ noted that while light work ordinarily requires the ability to stand for six hours, Plaintiff testified that such job actually required her "to stand or walk 2-3 hours during the day." (Tr. 36).  The ALJ did not explain, however, how Plaintiff could presently perform that past work, if she was limited to standing and walking for only two hours per day.

Alternatively, the ALJ found that even if Plaintiff is limited to sedentary unskilled work, and therefore cannot perform any of her past relevant work, she can still perform the job of "order clerk," as identified by the VE, which is sedentary unskilled work. (Tr. 36).  Consequently, the ALJ found that Plaintiff was not disabled.

On September 8, 2011, Plaintiff requested review by the Appeals Council.  On April 6, 2012, the Appeals Council denied Plaintiff's request for review.  On May 4, 2012, Plaintiff commenced this action.  On October 29, 2012, Defendant filed the subject motion [#3] for judgment on the pleadings.  On November 15, 2012, Plaintiff filed the subject cross-motion [#5] for judgment on the pleadings.  On June 13, 2013, counsel for the parties appeared before the undersigned for oral argument of the subject motions.

ANALYSIS

*The ALJ's Assessment of Plaintiff's Credibility*

Plaintiff contends that when the ALJ assessed her credibility, she erred in two respects.  First, Plaintiff contends that it was improper for the ALJ to make a negative credibility determination based on Plaintiff's non-compliance with Wadsworth's

21

recommendation to go on a diet.  In that regard, the ALJ stated that she could not

"disregard the fact that [Plaintiff] is not following a medically advised diet, particularly in a

case like this, as most of her limitations are secondary to her obesity." (Tr. 35).  The

Court agrees with Plaintiff that such observation was improper, since Wadsworth did not

specifically state either that she had prescribed a diet, or that Plaintiff was non-compliant

with such prescription.  Instead, Wadsworth stated only that Plaintiff was generally

"concompliant," without specifying how. (Tr. 371).  Moreover, Plaintiff did not testify that

she was not complying with Wadsworth's diet recommendation, but rather, she stated

that she did follow the diet, and initially lost weight, but that she then "leveled out." (Tr.

59).

Plaintiff also contends that the ALJ improperly doubted her credibility based on

her activities of daily living.  Specifically, the ALJ stated that Plaintiff's daily activities,

including housework and caring for her niece's son, contradicted her claimed inability to

perform basic work activities. (Tr. 34).  Plaintiff contends that such "limited daily activities"

are not inconsistent with disability.  However, the Court believes that the ALJ could

permissibly draw a negative inference regarding credibility from Plaintiff's daily activities,

including the fact that Plaintiff raised her niece and now cares for her niece's child.  In

that regard, it is arguably inconsistent for Plaintiff to be able to maintain her house and

care for a child while at the same time claiming to be unable to lift ten pounds.

### Wadsworth's Mental RFC Evaluation

Plaintiff next contends that the ALJ erred by "failing to adopt Dr. Wadsworth's

uncontradicted mental RFC evaluation." Pl. Memo of Law at p. 7.  Plaintiff states that the

ALJ was essentially required to accept Wadsworth's mental RFC evaluation, "[b]ecause

there is no medical opinion to contradict that evaluation." *Id*. at p. 8.  Plaintiff also argues

that the ALJ did not properly apply the treating physician rule, because in considering the

weight to give to Wadsworth's mental RFC evaluation, the ALJ did not consider the long

treating relationship between Wadsworth and Plaintiff, as required by 20 CFR §

404.1527(c)(2). *Id*.  Additionally, Plaintiff contends that the ALJ should have accepted

Wadsworth's mental RFC evaluation because it was consistent with Ersteniuk's findings,

and particular with Ersteniuk's GAF score of 50. *Id*. at 9.  Plaintiff further contends that,

according to the VE, a person with all of the mental limitations described in Wadsworth's

mental RFC evaluation would be unable to work at any job.

At the outset, the Court disagrees that the ALJ failed to consider 20 CFR §

404.1527(c)(2).  On that point, the ALJ specifically stated that she had "considered [the]

opinion evidence in accordance with the requirements of 20 CFR 404.1527," and her

discussion of Wadsworth's treating notes shows that she was familiar with the long

treating relationship between Plaintiff and Wadsworth.  The ALJ's decision to give only

"some weight" to Wadsworth's mental RFC evaluation was based on other factors, such

as the fact that it was inconsistent with Ersteniuk's mental status exams and Plaintiff's

own description of her daily activities.  In any event, Plaintiff's reliance upon her long

treating history with Wadsworth seems misplaced as to her depression, since Wadsworth

never reported observing any signs of depression during the years that she treated

Plaintiff.  Moreover, it was not until late 2010 that Plaintiff informed Wadsworth that she

was feeling depressed.[15]  Therefore, while there is a long treating history between

---

[15]Consequently, the statement in Plaintiff's brief, that Wadsworth treated her "on over forty occasions for a number of impairments including depression," while perhaps technically true, is misleading insofar as it suggests that Wadsworth treated Plaintiff for depression over a long period. *See*, Pl. Memo of Law at p. 7.

Plaintiff and Wadsworth generally as to Plaintiff's physical ailments, there is not a long treating history with regard to Plaintiff's claimed depression.

The Court also disagrees with Plaintiff's contention that Wadsworth's mental RFC assessment is "uncontradicted," since, as noted above, it is inconsistent with Ersteniuk's mental status exams. Wadsworth's notes do not indicate that she ever performed a mental status examination of Plaintiff. Ersteniuk, on the other hand, whose specialty is in the area of mental health, performed such examinations and found that Plaintiff had only "low grade depressive symptoms."[16] Unlike Wadsworth, Ersteniuk did not find that Plaintiff had impairments related to understanding, remembering, concentrating, making decisions or being aware of normal hazards. To the contrary, Ersteniuk reported that one of Plaintiff's strengths was her "good intellectual skills." (Tr. 352). And although Wadsworth prescribed Plaintiff Zoloft, after Plaintiff reportedly told Wadsworth that Ersteniuk had said Plaintiff needed such medication, Ersteniuk's own notes and treatment plans do not reference any need for medication.

Plaintiff nevertheless insists that Wadworth's opinions are consistent with Ersteniuk's, since Ersteniuk gave Plaintiff a GAF score of 50, suggesting "serious" symptoms or impairments. In that regard, a GAF score of 50 can reflect either "serious symptoms" or "serious impairments in social, occupational or school functioning," and Ersteniuk based her score on the latter category of "serious impairments" in occupational and social functioning. (Tr. 355). However, the ALJ explained that she did not give

---

[16]As to the apparent non-severity of Plaintiff's symptoms, it is worth reiterating that Plaintiff's entire past relevant work was satisfactorily performed during the fifteen years after her mother died, while Plaintiff was reportedly depressed about that event.

significant weight to the GAF score, since Plaintiff admittedly had friends[17] and cared for herself and her niece's son, and since Ersteniuk's exam basically showed only that Plaintiff was sad over her mother's death fifteen years earlier. (Tr. 27).[18]   Although Ersteniuk's GAF score suggests that Plaintiff has serious impairments in social functioning, the ALJ found that "the record fails to show any particular problem in [Plaintiff's] ability to relate adequately to others," (Tr. 28), and that observation is supported by substantial evidence.

The Court also notes that while Ersteniuk apparently interpreted the fact that Plaintiff is not currently working as suggesting that she is seriously impaired in her occupational functioning, there is no indication in the record that Plaintiff's unemployment is directly related to any of her claimed impairments, including her alleged depression.  In that regard, Plaintiff worked at three different jobs during the fifteen years following her mother's death, and the reason she stopped working in September 2009 was not due to her impairments, but was because funding for the job ran out.

The Court further notes that despite the aforementioned shortcomings in Wadsworth's mental RFC assessment, the ALJ still gave it some weight, and as a result, found that Plaintiff should be limited to simple tasks and instructions.  Based on that finding, Plaintiff contends that the ALJ subsequently erred by finding that she could

---

[17]*See*, Tr. 346 (Plaintiff has "few friends"); Tr. 355 (Plaintiff has "some friends").

[18]Even assuming, *arguendo*, that it was error for the ALJ to give less than significant weight to the GAF score, such error would seem to be relatively harmless since the GAF score is just one factor to be considered, and because, at most, the GAF score tells us that Plaintiff has "serious" impairments in occupational and social functioning, without specifying or quantifying any limitations flowing from that term.  In an analogous situation, discussed below, Plaintiff contends that Toor's report is essentially meaningless, since, she contends, his use of the terms "moderate" and "severe" are ambiguous. *See*, Pl. Memo of Law at p. 11 ("This information is not sufficiently specific to provide any useful information about Ms. Dowd's capabilities.").  Plaintiff cannot have it both ways.

perform her past secretarial work, since such work has a specific vocational preparation ("SVP") rating of 3, which Plaintiff maintains is inconsistent with simple work. Regardless of whether that is true, however, the Court cannot see how the ALJ arrived at her finding of as to the "simple work" limitation in the first place.  That is, as already discussed, the relevant evidence in the record indicates that Plaintiff's intellectual functioning is fine.  Even Wadsworth indicated that Plaintiff had a good ability to remember work procedures and detailed instructions and an unlimited ability to exercise appropriate judgment. (Tr. 375).  The Court therefore finds that on the present record, the ALJ's determination that Plaintiff is limited to simple work is not supported by substantial evidence, and Plaintiff's contention that she cannot perform the mental demands of her past secretarial work therefore lacks merit.

### Wadsworth's Physical RFC Evaluation

Plaintiff next contends that the ALJ erred by giving greater weight to Toor's opinion than she did to Wadsworth's opinions.[19]  On that point, Wadsworth stated, for example, that Plaintiff could not lift and carry ten pounds or work more than two days per week.[20]

According to Plaintiff, Toor's opinion is not "substantial evidence to contradict Dr. Wadsworth's opinion." Pl. Memo of Law at p. 10.  In this regard, Plaintiff seems to argue that the ALJ was required to accept Wadsworth's treating-physician opinion, since Toor's

---

[19]Plaintiff also contends that the ALJ erred by relying on the  ME's opinion, since that opinion does not constitute substantial evidence.  The Court agrees that the ME's opinion is of little value, since it seems to be primarily based on the opinion of Valla, who never examined Plaintiff, and who medical qualifications are not set forth in the record.

[20]See, Pl. Memo of Law at p. 10.

opinion was not "substantial" enough to overcome it.  However, the ALJ did not merely choose to reject Wadsworth's opinions in favor of the opinions of Toor.  The ALJ first considered Wadsworth's opinion under the treating physician rule, and found that it was not entitled to controlling weight, although she found that part of it was entitled to "significant weight," while the rest of it was only entitled to "little weight." (Tr. 32). Specifically, the ALJ essentially adopted Wadsworth's opinion regarding Plaintiff's ability to sit, but modified it slightly *in Plaintiff's favor*, to allow Plaintiff to sit for six hours, instead of seven, with the option to change positions at will. (Tr. 32).  As for Wadsworth's opinions about Plaintiff's ability to stand, walk and lift, and her opinion that Plaintiff can work only two days per week, the ALJ gave them only little weight, since those opinions are not supported by relevant findings in Wadsworth's medical file. *Id*.  For example, the ALJ observed that the evidence of any medical condition to explain Plaintiff's lower-back pain was extremely scant, consisting only of Wadsworth's observation of a muscle spasm on one occasion. (Tr. 32).  Moreover, there is nothing in Wadsworth's records to support her statement that Plaintiff is unable to lift even ten pounds.  To the contrary, Plaintiff indicates that at her secretarial job, she frequently lifted and carried items weighing twenty pounds, and there is no explanation for why her ability to lift would have diminished so drastically. (Tr. 60).  Furthermore, Wadsworth's opinion that Plaintiff could work only two days per week seems to be supported by nothing, except the fact that Plaintiff was doing volunteer work only two days per week.  However, there is no support in the record indicating that Plaintiff's claimed impairments prevented her from working more than that.  Rather, the record indicates that Plaintiff stopped working in September 2009 because funding for her position ended, and there is only vague testimony

27

concerning her efforts to seek work after that.  Thus, it does not seem that there was any

basis for Wadsworth to estimate that Plaintiff could in fact work only two days per week.

On the other hand, the ALJ gave "great weight" to Toor's opinion, finding that it

was "consistent with [Toor's] findings on examination of [Plaintiff] and with the overall

objective evidence in the record." (Tr. 33).  Although the ALJ did not specifically identify

such other "overall objective evidence in the record" as part of her discrete discussion of

Toor's opinion, she did note elsewhere in her opinion, accurately, in the Court's view,

that, "[a] longitudinal review of the record further shows that the claimant's medically

determinable impairments are long-standing conditions, which did not prevent the

claimant from working before and which did not appear to aggravate at the alleged onset

date." (Tr. 35).  Further on this point, the ALJ noted that, despite those same conditions,

Plaintiff had been able to perform the exertional requirements of medium and light work

as part of her past relevant work. (Tr. 30).

As for Toor's objective findings, the results of his physical examination were

unremarkable, except for Plaintiff's obesity and somewhat limited range of lumbar spine

flexion and extension. (Tr. 329).  Significantly, Toor found that Plaintiff had full strength in

her upper and lower extremities and full grip strength in her hands, and with regard to

lifting, he indicated that Plaintiff had limitations only as to "heavy lifting." (Tr. 329-330).

Wadsworth, on the other hand, does not appear to have performed any testing, yet

opined that Plaintiff was essentially unable to lift anything.

Unfortunately, as Plaintiff points out, Toor did not explain exactly what Plaintiff can

and cannot do.  Instead, Toor stated only that Plaintiff has "moderate limitations" or

"moderate to severe" limitations. (Tr. 330).  The Second Circuit has held that such

opinions are too vague to constitute substantial evidence. *See, Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (The ME's "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [the claimant can work]."), *superceded by regulations on other grounds by*, 20 C.F.R. § 404.1560(c)(2).  Because of this vagueness in Toor's report, and because Wadsworth's physical RFC findings are largely unsupported, there is really no substantial evidence in the record concerning Plaintiff's ability to lift, carry, stand and walk.[21]

Plaintiff further argues, though, that even if there was substantial evidence to support the ALJ's RFC determination, her decision is still erroneous insofar as it found that Plaintiff could perform her past relevant secretarial work, since the requirements of such work, as Plaintiff actually performed it, exceeds the limitations set forth in the RFC assessment.  That is, the ALJ found that Plaintiff could perform such past work, which required Plaintiff to stand for up to three hours, even though the ALJ's RFC findings limit Plaintiff to standing for only two hours. (Tr. 36).  Plaintiff insists that because of this inconsistency, the Court should find that she cannot perform her past relevant work.

The Court agrees with Plaintiff that there is an inconsistency on this point, since at one place in her decision the ALJ states that Plaintiff can only stand/walk for two hours, (Tr. 29), and at another place she states that Plaintiff can stand/walk for up to three hours. (Tr. 36).  The Court also agrees that if Plaintiff in fact cannot stand/walk for more than two hours, then she cannot perform her past relevant secretarial work, since such

---

[21]The ALJ adopted Wadsworth's opinion regarding Plaintiff's ability to sit.

work required her to stand up to three hours at times.  The problem, though, as the Court

mentioned previously, is that there is really no substantial evidence in the record

presently to support the ALJ's RFC finding that Plaintiff can only stand/walk for two

hours.  The truth is that Plaintiff may be able to stand for more than two hours, or less

than two hours, but at this time the Court does not have sufficient evidence to resolve

that issue.  Accordingly, the Court finds that this matter must be remanded for further

development of the record.

Of course, the ALJ made an alternative finding at step five of the sequential

analysis, and found that Plaintiff could perform the job of "order clerk," which the ALJ

described as sedentary unskilled work.  Plaintiff contends that such ruling is also

erroneous, since the ALJ failed to consider or apply Grid Rule 201.14, which would have

required a finding that Plaintiff is disabled.  In that regard, Rule 201.14 states that where

the claimant is a person "closely approaching advanced age, 50-54," with a high school

education or more, whose previous work experience was skilled or semi-skilled but the

skills are not transferable, the person is disabled. *See*, 20 CFR Pt. 404, Subpart P,

Appendix 2, Rule 201.14 (West 2013).  In this case, Plaintiff is a person closely

approaching advanced age, 53, with a high school education, one year of college and

nursing training, whose previous work was semi-skilled.  Additionally, when describing

Plaintiff's past relevant work, the VE stated that there was "no transferability of skills

present." (Tr. 71).  Moreover, the job which the ALJ identified at step five was unskilled,

and there is no transferability of skills to unskilled work. *See*, SSR 00-4p, 2000 WL

1898704 at *3 (S.S.A. Dec. 4, 2000) ("[A]n individual cannot transfer skills to unskilled

work or to work involving a greater level of skill than the work from which the individual

acquired those skills.") (citation omitted).  Accordingly, there is certainly persuasive

weight to Plaintiff's argument that grid rule 201.14 requires a finding of "disabled."

However, as already discussed, it is unclear whether Plaintiff can perform her past

relevant work, due to unresolved issues about her RFC.  If, upon remand, it is

determined by substantial evidence that she can perform her past relevant work, then

Plaintiff's argument about the grids would be moot.  Alternatively, in the event that it is

determined by substantial evidence that Plaintiff cannot perform her past relevant work,

then at step five the ALJ should, as appropriate, consider the applicability of the grid

rules, which she previously failed to do.[22] *See, Quinones on Behalf of Quinones v.*

*Chater*, 117 F.3d 29, 36 (2d Cir. 1997) ("As the ALJ did not address this evidence, we

think it best to remand the case so that he can consider in the first instance what weight

to accord it."); *see also, Kearney v. Barnhart*, No. 05-CV-1860 (JG), 2006 WL 1025307

at *7, n. 15 (E.D.N.Y. Apr. 17, 2006) ("Although the court may reverse an ALJ's decision

and order the payment of benefits in a case in which 'the record provides persuasive

proof of disability and a remand for further evidentiary proceedings would serve no

purpose,' *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980), the evidence in this record

does not meet that standard.").

---

[22]Defendant contends that it was appropriate for the ALJ to ignore Rule 201.14, and to rely upon the VE's testimony that Plaintiff could perform the job of "order clerk," particularly since Plaintiff has non-exertional impairments. See, Def. Reply Memo of Law at p. 8.  However, the Court disagrees.  At the outset, the authority upon which Defendant relies is not on point, since it merely supports the idea that vocational experts may be used generally to assist the ALJ. *Id*.  Defendant does not cite any authority for the idea that an ALJ has the discretion to bypass Rule 201.14.  Furthermore, while it is true that an ALJ should obtain a VE's testimony in situations where a claimant has non-exertional impairments and the grids do *not* require a finding of disabled based on exertional impairments alone, the ALJ may not rely on a VE's testimony to avoid the grids when they would require a finding that the claimant is disabled. *See, Stanley v. Astrue*,  2010 WL 1416886 at *6 (C.D.Ill. Mar. 31, 2010) ("When the Grids apply and direct a finding of disabled, an ALJ cannot rely upon vocational expert evidence to reach a conclusion to the contrary.") (citing *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir.2005)), *aff'd*, 410 Fed.Appx. 974 (7th Cir. Jan. 7, 2011).

To the extent that the Court has not specifically addressed Plaintiff's remaining arguments, the Court has nonetheless considered them and finds that they lack merit.

CONCLUSION

For the reasons set forth above, Defendant's motion for judgment on the pleadings [#3] is denied, Plaintiff's cross-motion for judgment on the pleadings [#5] is granted, and this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order, pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
       July 10, 2013

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge